In re Sandra P. DAVIS, Debtor.

Sandra P. DAVIS, Plaintiff,

v.

VICTOR WARREN PROPERTIES, INC. and Merrill Lynch Credit Corp., Defendants.

Bankruptcy No. 97–60268.
Adversary No. 97–6038.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Nov. 7, 1997.

J. Timothy White, John P. Gallagher, Varner, Stephens, Humphries & White, L.L.P., Atlanta, GA, for Sandra P. Davis.

John R. Grimes, Lefkoff, Duncan, Miller, Grimes, Miller & Barwick, P.C., Atlanta, GA, for Victor Warren Properties, Inc.

William B. Brown, George H. Myshrall, Jr., Heyman & Sizemore, Atlanta, GA, for Merrill Lynch Credit Corp.

### ORDER DENYING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

JAMES E. MASSEY, Bankruptcy Judge.

Sandra Davis seeks to invalidate a foreclosure sale conducted prior to the petition date by a secured creditor, Merrill Lynch Credit Corporation (formerly known as Merrill Lynch Equity Management, Inc.) ("Merrill Lynch"), at which Victor Warren Properties, Inc. ("VWP") was the successful bidder. The property at issue is a residence located at 1295 West Garmon Road, Atlanta, Georgia ("the Property"). Mrs. Davis' complaint states two claims for relief. In Count I, she contends that under state law, the sale should be set aside on the ground that it was not regularly conducted, resulting in an inadequate price. In Count II, she asserts that the price obtained at the foreclosure sale was so inadequate that she was rendered insolvent by the transfer, which should be avoided as a fraudulent transfer under section 548(a)(2)(A) of the Bankruptcy Code. The two counts are linked by a common issue: whether the exercise of the power of sale was so unfair or irregular that under state law the sale may be set aside. Mrs. Davis contends that Merrill Lynch improperly conducted the sale by failing to advertise it properly and by making an announcement at the sale, which, she says, chilled the bidding. She has withdrawn a third count based on a state statute.

Defendants dispute that the bidding was chilled, contending that the sale advertisement was accurate and that the announcement made at the sale did not affect the bid price. They also contend that the sale did not render Mrs. Davis insolvent. Defendants move for summary judgment. The court has carefully reviewed the record and the arguments of each of the parties. Based on that review, the court holds that material issues of fact exist, mandating that the motions be denied.

The parties assume that the court has jurisdiction to decide the disputed issues and consequently have not addressed jurisdictional issues in their briefs. Close examination reveals limits, however, on the court's authority to resolve this dispute.

As a general proposition, this court has subject matter jurisdiction in bankruptcy matters pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the Order of Reference of the United States District Court for the Northern District of Georgia entered on July 12, 1984 and Local Rule 83.7(A) of that court. With regard to the claims stated here, the court has jurisdiction to hear Count I only if it is "related" to the Debtor's Chapter 13 case within the meaning of 28 U.S.C. § 1334(a). Count I is not a core proceeding within the meaning of 28 U.S.C. § 157(b), and the parties have not consented to having this court enter a final judgment with regard to Count I. Proceedings to avoid a fraudulent conveyance under section 548 of the Bankruptcy Code are core under 28 U.S.C. § 157(b)(2)(H), and hence the court has jurisdiction to enter a final judgment as to Count II.

As noted, jurisdiction over Count I rests on its being "related" to the bankruptcy case.

The issue raised in Count I, whether the sale was so irregularly conducted that the sale should be set aside, is an element of the claim in Count II. As will be developed below, the contention in Count II that the sale price was not adequate consideration depends on a determination that the sale was not conducted according to state law. Hence, as a practical matter, Count I is unnecessary if the sale can be set aside under section 548 as a fraudulent conveyance. Similarly, if the Plaintiff were to lose on the issue of adequacy of the consideration in Count II, Count I would also be without merit. The third and last alternative in this series of possible outcomes is that the Plaintiff loses Count II, not because the price was inadequate, but because she was solvent. But if she is solvent, no bankruptcy purpose would be served in resolving the issue raised in Count I, and the court would lack jurisdiction altogether to adjudicate it. *Cf. Walker v. Littleton (In re Littleton)*, 888 F.2d 90 (11th Cir.1989). To say that no bankruptcy purpose would be served is to say that the claim would not be "related" to the Debtor's bankruptcy case within the meaning of 28 U.S.C. § 1334(a). *See, Community Bank of Homestead v. Boone (In re Boone)*, 52 F.3d 958 (11th Cir.1995).

■ Nor does 28 U.S.C. § 1367 supply a basis for the exercise of jurisdiction by a bankruptcy court in non-core cases, even with consent. *Walker v. Cadle Co. (In re Walker)*, 51 F.3d 562, 570 (5th Cir.1995). Even if the district court were deciding the matter, it is doubtful that section 1367, dealing with supplemental jurisdiction, would apply, since the court would be exercising its original jurisdiction under the limitations of 28 U.S.C. § 1334 and hence would be limited by the holding of *Boone*.

Subject-matter jurisdiction is not the only problem the complaint, as framed, presents. With a limited exception, Plaintiff lacks the capacity in her role as a Chapter 13 debtor to sue on the claims set forth in the complaint. This type of deficiency is sometimes described as a standing problem, but it is not in a constitutional sense. No doubt she has an interest in the outcome of her claims in the complaint so that they would "fall within the zone of interests protected by the law invoked." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984). Yet, as will be discussed below, what she lacks is statutory authorization to maintain Count I. Similarly, Mrs. Davis has only limited authority to bring Count II.

■ Count I of the complaint is purely a claim under state law for the setting aside of a wrongful foreclosure. This claim became property of the estate at the time of the filing of the bankruptcy case. 11 U.S.C. §§ 541 and 1306. If the bankruptcy court does not order otherwise, property of the estate revests in the debtor upon confirmation of the plan. 11 U.S.C. § 1327(b). Here, no plan has been confirmed, so that the claim against the Defendants in Count I remains property of the estate.

As a general rule, a Chapter 13 debtor remains in possession of property of the estate. That circumstance might seem to suggest that the debtor would have the authority to prosecute causes of action in the debtor's name alone. The statutory scheme dealing with the prosecution of causes of action in a Chapter 13 case is not entirely clear, but it points to a different conclusion. A Chapter 7 trustee's duty to collect and reduce to money the property of the estate under section 704(1) encompasses the power to bring suit on claims, but the Chapter 13 trustee's duties in section 1302(b)(1), which refers to section 704, omits the section 704(1) duty. (The same is true, by the way, of a Chapter 11 trustee. 11 U.S.C. § 1106(a)(1).) A Chapter 13 trustee does, however, have the duty in section 704(2) to "be accountable for all property received," 11 U.S.C. § 1302(b)(1), as does a Chapter 11 trustee, 11 U.S.C. § 1106(a)(1). Significantly, section 323 of the Bankruptcy Code provides that the trustee is the estate's representative with the capacity to sue.

In a Chapter 11 case, a debtor in possession is authorized to "perform the functions and duties" of a Chapter 11 trustee. 11 U.S.C. § 1107(a). Congress included no similar provision in Chapter 13. Instead, the parallel section of Chapter 13, section 1303, states: "[s]ubject to any limitations on a trustee under this chapter, the debtor shall

have, exclusive of the trustee, the rights and powers of a trustee under sections 363(b), 363(d), 363(e), 363(f), and 363(*l* ), of this title." All of those subsections of section 363 deal with the sale, use or lease of property of the estate and have nothing to do with the Chapter 13 debtor's prosecution of a state law cause of action.

If the debtor in a Chapter 13 case could prosecute claims belonging to the estate prior to the confirmation of a plan, the debtor would have the power, and not just theoretically, to destroy the value of those claims by mishandling the suits. Congress was very specific in describing the powers of Chapter 13 debtors in section 1303. The power to prosecute claims belonging to the estate is not one entrusted to the debtor, at least if the claims are not generated and handled in the ordinary course of a business operated by a self-employed debtor under section 1304(b).

The duty under section 1302(b)(1) to be accountable for property received (which might include claims or causes of action), particularly when considered in light of section 323, probably provides all the statutory authorization necessary for a Chapter 13 trustee to sue on claims prior to confirmation. The issue of the trustee's authority will rarely arise because there is usually a short period of time between filing and the entry of a confirmation order. If a plan and confirmation order result in revesting property of the estate in the debtor, then the debtor could prosecute a state law claim that, prior to confirmation, was property of the estate. Otherwise, except as provided in the plan or confirmation order, the trustee would be a necessary party to any litigation. In short, the Bankruptcy Code does not authorize Mrs. Davis to bring Count I of the complaint.

Count II of the complaint states a claim under section 548(a) of the Bankruptcy Code. That section provides in pertinent part that "[t]he trustee may avoid any transfer of an interest of the debtor in property...." This section specifically empowers the trustee to avoid fraudulent transfers but says nothing about granting debtors the same power. Where "the statute's language is plain, 'the sole function of the courts is to enforce it according to its terms.' " *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), *quoting Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 194, 61 L.Ed. 442 (1917). Here, the terms of the statute are clear. Section 548 empowers only a trustee to avoid a fraudulent transfer and does not give a Chapter 13 debtor standing to bring a fraudulent conveyance action. *Hollar v. United States,* 174 B.R. 198 (M.D.N.C.1994). Consequently, Mrs. Davis lacks standing in her capacity as a Chapter 13 debtor to bring a suit under section 548.

Even though Mrs. Davis lacks standing under section 548, section 522 provides her with limited authority to maintain this adversary proceeding. Under section 522(h),

[t]he debtor may avoid a transfer of property of the debtor or recover a setoff to the extent that the debtor could have exempted such property under subsection (g)(1) of this section if the trustee had avoided such transfer, if—

(1) such transfer is avoidable by the trustee under section ... 548 ...; and

(2) the trustee does not attempt to avoid such transfer.

Pursuant to section 522(b)(1), Georgia has "opted out" of the federal exemptions listed in § 522(d). O.C.G.A. § 44–13–100(b) is available to persons domiciled in Georgia. O.C.G.A. § 44–13–100(a)(1) provides that a debtor may exempt "[t]he debtor's aggregate interest, not to exceed $5,000.00 in value, in real property or personal property that the debtor or a dependent of the debtor uses as a residence...." The Chapter 13 Trustee has not sought under section 548 to avoid the transfer about which the Debtor complains; hence, Mrs. Davis has standing to avoid the foreclosure sale, but only to the extent she could exempt or has exempted the Property under section 522. In the Debtor's Amended Schedule C, filed on May 13, 1997, she claims an exemption of $5,000 in the value of the Property.

Unless Mrs. Davis' case is converted from Chapter 13 to one under Chapter 7 or Chapter 11, Defendants could moot Count II of this adversary proceeding by tendering

$5,000 to her. There is no point in avoiding the sale to permit Mrs. Davis to claim her exemption, if Defendants tender to her the amount she contends she is entitled to exempt. The court will afford Mrs. Davis an opportunity for a period of ten (10) days from the date of this order to convert this case to a chapter in which Mrs. Davis or another trustee would have standing. Alternatively, the Debtor may be able to preserve the section 548 claim by persuading the Chapter 13 Trustee to join in this adversary proceeding as a party plaintiff; in that event, however, whether the case should be resolved prior to confirmation would be problematical.

Because it is extremely unlikely that Mrs. Davis will opt to accept $5,000 from the Defendants and thereby permit this case to be dismissed and because there is no evidence that the Defendants have already tendered $5,000 to Mrs. Davis, the summary judgment motions are ripe for resolution. The ruling may be helpful in resolving the dispute.

Now for the facts, disputed and undisputed. In June 1984, Sandra Davis and her husband, Bruce Davis, borrowed $259,000 from Merrill Lynch, secured by the Property. Then, as now, Mr. Davis had no recorded interest in the Property, but he executed the note and security deed.

The note matured in mid–1994. On November 9, 1994, Merrill Lynch approved Mr. Davis' application to refinance the loan in the amount of $297,300, conditioned on the loan closing by December 1, 1994. Mr. Davis testified that Merrill Lynch stated they would contact him in 1995 to set up the closing, which had been postponed at Mr. Davis' request. Transcript, Bruce Davis Deposition 21. Mr. Davis claims that Merrill Lynch did not communicate with him again until April or May of 1996. Transcript, Bruce Davis Deposition 21–22.

On April 29, 1996, Merrill Lynch wrote Mr. and Mrs. Davis, notifying them that the loan had matured and that if payment were not made by May 29, 1996, Merrill Lynch might begin foreclosure proceedings without further notice. Transcript, Bruce Davis Deposition 65–67. During the summer of 1996, Mr. Davis asked Merrill Lynch either to extend the term of the note or to renegotiate the loan. Merrill Lynch refused to negotiate with Mr. Davis unless he submitted a new loan application.

In a letter dated September 29, 1996 to Mr. and Mrs. Davis, an attorney for Merrill Lynch informed them that it intended to foreclose on the Property on November 5, 1996. In early October, Mrs. Davis opened a letter from an attorney that "said something about your home in foreclosure." Transcript, Sandra Davis Deposition 57–58. When Mrs. Davis mentioned the letter to Mr. Davis, he told her that everything would be taken care of. *Id.*

During October 1996, Merrill Lynch ran a foreclosure advertisement. The ad contained this sentence:

> Under and by virtue of the power of sale contained in a Security Deed given by Bruce R. Davis and Sandra B. Davis to Merrill Lynch Equity Management, Inc., dated June 25, 1984, recorded in Deed Book 9059, page 353, Fulton County, Georgia records, conveying the after described property to secure a note in the original principal amount of Two Hundred Fifty Nine Thousand and No/100 Dollars ($259,-000.00), with interest thereon as set forth therein, there will be sold at public outcry to the highest bidder for cash before the courthouse door of Fulton County, Georgia, within the legal hours of sale on the first Tuesday in November, 1996, the following described property....

Statement of Undisputed Facts of Merrill Lynch at ¶ 46.

On October 15, 1996, Mr. Davis submitted to Merrill Lynch an application to refinance the loan. Transcript, Bruce Davis Deposition 87. It is undisputed that no one from Merrill Lynch told Mr. Davis the application would be approved. Nonetheless, Plaintiff contends that Mr. Davis believed that the application would be approved or that Mr. Davis would receive an additional thirty days' notice of Merrill Lynch's intent to foreclose on the Property. On November 4, 1996, the day before the foreclosure sale, Merrill Lynch denied Mr. Davis' application for refinancing.

On that same day, Mr. Davis contacted the law firm of Clark and Washington "[t]o discuss the foreclosure sale and how we could stop it." Transcript, Bruce Davis Deposition 106. Mr. Davis contends that he employed Clark and Washington to represent him and Mrs. Davis. *Id.* at 106. Mrs. Davis agreed with this contention, testifying that "he [Mr. Davis] consulted Clark and Washington on my behalf because I think I told him to do it—I think I told him to do whatever you have to do to keep this house.... It was my house, but it pertained to both of us. Whatever advice Clark and Washington gave him was for the benefit of both of us." Transcript, Sandra Davis 133. Christopher Kiefer, the attorney handling Mr. Davis' bankruptcy, testified on deposition, however, that such a claim "would be false. I don't know that I've ever spoken to her [Mrs. Davis]." Transcript, Kiefer Deposition 69.

The battle between the Davises and Merrill Lynch was not the only one affecting the Property. The Internal Revenue Service had filed a lien against the Property, which may account for their failure or inability to obtain refinancing. The taxes at issue are for the most part owed by Mr. Davis alone. The federal tax lien signals that the I.R.S. contends that Mr. Davis has an interest in the Property, notwithstanding the fact that it has always been titled in Mrs. Davis' name.

On November 5, 1996, Mr. Davis filed a Chapter 13 petition in this court. Mr. Kiefer's office then contacted Merrill Lynch's attorneys to inform them of Mr. Davis' bankruptcy, "[o]n the assumption that they would stop the sale or not conduct the sale." Transcript, Kiefer Deposition 28. Later in the day, Judy Sloman, an attorney for Merrill Lynch, contacted Mr. Kiefer, seeking consent to cry out the foreclosure sale of the Property, subject to approval by the bankruptcy court. Transcript, Kiefer Deposition 6–7.

At his deposition, Mr. Kiefer was asked questions about general procedures relating to foreclosure sales conducted after bankruptcy filings. *Id.* at 7–11. Some of those questions had as a premise the making of a "bankruptcy validation announcement," but those questions, to which objections were made, did not elicit any admissible answer

from Mr. Kiefer that he consented to the announcement at the Davis foreclosure. Mr. Kiefer testified that he was under the impression that such announcements were not made at such sales. *Id.* at 58. Mr. Kiefer was asked, "[e]arlier you had said that it's fairly custom practice, customary practice to get a phone call like you got from Judy and y'all say go ahead and sell subject to bankruptcy validation announcement?" *Id.* at 60. Mr. Kiefer responded, "[c]orrect." Particularly in light of earlier testimony, it is not clear from the form of this question and from the response that Mr. Kiefer meant to convey that he had consented to the announcement. When asked whether there were any stipulations on her agreement with Mr. Kiefer "to go ahead and cry out the foreclosure sale without an emergency hearing," Ms. Sloman answered, "No, there were not." Transcript, Sloman Deposition 17. There is no evidence that Mr. Kiefer consented to announcing at the sale that the bankruptcy court's approval would be necessary.

Mr. Kiefer testified that during this conversation, Ms. Sloman informed him that it would be announced at the sale "that a bankruptcy had been filed and that the sale was being cried subject to approval of a bankruptcy court" and that Mr. Davis was not on the loan. Transcript, Kiefer Deposition 29 and 51. Mr. Kiefer testified that he never would have consented to the sale had Ms. Sloman stated that Mr. Davis was on the note. *Id.* Ms. Sloman, on the other hand, does not recall telling Mr. Kiefer that Mr. Davis was not on the note. Transcript, Sloman Deposition 10. Mr. Kiefer testified that if he had known that Mr. Davis had signed the note, he would have told Merrill Lynch to file a claim. *Id.* at 21–22.

Merrill Lynch auctioned the Property at a foreclosure sale on November 5, 1996. Prior to the sale, Mr. Jeff Sweeton, a foreclosure agent for Merrill Lynch, was instructed to read an announcement about the terms of the sale. The text of the announcement, prepared by Merrill Lynch's attorneys, is as follows:

Bruce Davis filed a Chapter 13 Bankruptcy Case on 11/4, 1996. However, the title examination indicates that Bruce

Davis is not currently the record title holder of the property. Bruce Davis' attorney has given us permission to cry this sale subject to approval by the U.S. Bankruptcy Court. Approval will take about five or six weeks. During this period, we will not be able to deliver the deed under power to you, nor will you be able to evict the people residing in the property. If we are unsuccessful in validating the sale, the funds you tender at this sale will be returned, without interest.

Plaintiff's Exhibit 1.

There were "anywhere from ten to a hundred" people on the courthouse steps on November 5, 1996, according to Mr. Warren. Transcript, Warren Deposition 31. Mr. Sweeton testified that

There were other bidders around. You know, there were other investors, people wanting to buy property, but he [Victor Warren] was the only one interested in this property.... [No one else was interested] [b]ecause if they would have [been interested], they would have approached us. I yelled it out very loudly that this was 13—the address. I generally yell out the address on the courthouse steps. If anybody's interested, they'll get there. If they're not, it's not—we'll yell out the address. If they're interested, they'll come. If not, they'll go to another one.

Sweeton Deposition at 25.

Mr. Sweeton initially stated that he read the entire announcement. He later said, "To be honest, I can't remember exactly what I read out on that foreclosure day because we do so many of these." Transcript, Sweeton Deposition 35–37 and 48–50. Mr. Sweeton then stated that he "would have read Bruce Davis filed a Chapter 13 bankruptcy" and that "the title examination indicates that Bruce Davis is not currently the record title holder of the property." *Id.* at 49. He added that he announced that "Bruce Davis' attorney has given us permission to cry this sale ... subject to approval by the U.S. Bankruptcy Court," and that "[a]pproval will take about four—will take about five or six weeks. During this period we will not be able to deliver the deed under power to you, nor will you be able to evict ... the people

residing in the property. If we are unsuccessful in validating the sale, the funds you tender at this sale will be returned to you—will be returned without interest." *Id.* at 49–50.

To insure he is heard at foreclosure sales, Mr. Sweeton talks "very loudly. It's almost like a low yell." Sweeton Deposition at 38. When questioned about whether he believed other people could hear him cry out the sale, Mr. Sweeton answered, "Yes, sir, I do." *Id.* Mr. Victor Warren, of VWP and the successful bidder at the foreclosure sale, testified similarly. At his deposition, Mr. Warren was asked, "[T]he announcement about the bankruptcy and the fact that the sale was now being conducted, was that made privately between you and Jeff, or was it made on the open steps of the Fulton County Courthouse ... did he [Mr. Sweeton] conduct it in a fashion that made the property available to anybody on the steps that was interested, or did he make it just to you privately?" Transcript, Warren Deposition 117. Mr. Warren answered that, "It was just an open reading to anybody that had an interest." *Id.*

VWP bid $360,400.33 for the Property and was the sole and successful bidder. Transcript, Sweeton Deposition 22, 29–31. In her bankruptcy Schedules, Mrs. Davis valued the property at $800,000. At a deposition she testified that "it's worth more than that.... [From] my estimate from the houses in the area, my house is worth a million or more." Transcript, Sandra Davis 18. Neither Merrill Lynch nor VWP offered evidence to contradict Mrs. Davis' testimony that the Property is worth at least twice and perhaps triple the bid price.

In Mr. Davis' Chapter 13 case, Merrill Lynch and VWP moved for an order annulling the automatic stay created under section 362 at the filing of the petition, if it applied to the Property, and alternatively permitting the recordation of a deed to VWP. Mr. Davis opposed the motion, contending that the automatic stay invalidated the foreclosure sale. He argued that the stay protected an interest in the Property arising from his marriage and from his occupancy of the Property. Nonetheless, consistent with his position that he had no interest in the Property to which a

federal tax lien could attach, he maintained that the Property was not property of the estate but belonged solely to his wife. Following a hearing on the motion, the court rejected Mr. Davis' contention that the automatic stay protected the interests he claimed in the Property. The court entered an order on December 19, 1996 holding that the stay had no effect on the foreclosure sale and dismissing Mr. Davis'· case on the ground that he filed it in bad faith. On January 6, 1997, Mrs. Davis filed a Chapter 13 petition.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c), incorporated in Fed.R.Bankr.P. 7056. The moving party bears the initial burden of proof to establish that no·genuine factual issue exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–2553, 91 L.Ed.2d 265 (1986); *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). The movant must point to the pleadings, discovery responses or supporting affidavits which tend to show the absence of a genuine issue of material fact. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–2553. The court must construe this evidence in the light most favorable to the non-moving party. *Rollins v. TechSouth, Inc.,* 833 F.2d 1525, 1528 (11th Cir.1987). Where the moving party satisfies its burden, the burden of going forward shifts to the non-moving party to demonstrate that a genuine issue of material fact indeed exists. Once the burden has been shifted, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

■ Count I and Count II overlap, but since the Debtor lacks standing to bring Count 1, there is no need to address the

claim raised there separately from the section 548 claim in Count II. Section 548 permits a trustee to avoid fraudulent transfers if the trustee can establish (1) that the debtor had an interest in.the property, (2) that a transfer of that interest occurred on or within one year of the petition date, (3) that the debtor either was insolvent at the time of the transfer or became insolvent because of the transfer and (4) that the debtor received "less than a reasonably equivalent value in exchange for such transfer." 11 U.S.C. § 548(a)(2)(A). Here, there is no dispute that the Debtor had an interest in the Property at the time of the foreclosure sale and that the sale occurred within one·year of the petition date. The parties dispute the remaining two elements of the fraudulent conveyance claim.

■ The Debtor alleges in her complaint that the foreclosure sale rendered her insolvent. The Defendants contest that allegation but only in a cursory manner, devoting most of their argument to the issue of whether the bidding was chilled. In its brief supporting its summary judgment motion, filed on May 5, 1997, VWP pointed out that the Debtor's original Schedules showed her to be solvent and that she had testified in February 1997 on deposition that the Schedules, as then amended, showed her liabilities and assets. On May 13, 1997, a week after VWP pointed out a fatal defect in the Plaintiff's case, Mrs. Davis again amended her Schedules. On the First Amended Schedule B, she valued her personal property at $203,974.[1] Excluding the mortgage and tax claims related to the Property, Mrs. Davis listed on her Second Amended Schedule F claims of $222,459.88.[2]

Two of the claims, totaling together $194,-588.76, are listed as disputed and contingent. Mrs. Davis does not disclose in the Schedules how much, if any, of those claims are in her view legitimate. Both creditors have filed proofs of claim. David, Inc. listed by Mrs. Davis at $20,000, filed a proof of claim for

---

1. Mrs. Davis values furs and jewelry at $136,012 on amended Schedule B, referencing an attached sheet for the details. An examination of the attached sheet indicates, however, that the total of the values assigned by Mrs. Davis to these items is $141,867.

2. Mrs. Davis lists on her Second Amended Schedule F unsecured nonpriority liabilities claims in the summary of schedules as $222,-459.88, though inexplicably she lists the total for Schedule F on the summary balance sheet as $227,366.75.

$32,490.95. The amended proof of claim of the City of Riverview, Michigan totals $311,528.96, compared to $174,588.76 as the disputed scheduled amount. Riverview filed its claim as secured, but it is unclear how much, if any, of the claim is unsecured or what interest, if any, Mrs. Davis has in the collateral securing the claim. Notwithstanding the fact that Mrs. Davis disputes these claims and, if successful in objecting to them, might not have been rendered insolvent by the transfer of the Property, the court must construe the facts in a light most favorable to the non-moving party. Although the liabilities to David, Inc. and the City of Riverview are scheduled as contingent and disputed, the Defendants offered no evidence to show that those claims are not valid as filed. Hence, there is an issue of fact about the effect of the transfer on her solvency.

The Debtor will not be permitted to object to the claims of the creditors and at the same time contend that the claims are valid so as to render her insolvent. If these claims are disputed in whole or in part, those disputes must be resolved in the claims objection process in which all parties in interest may participate. (The claimants would not be bound by the outcome of this adversary proceeding). Moreover, if those claims are clearly allowable, the Debtor may be ineligible to be a Chapter 13 debtor. Under 11 U.S.C. § 109(e), only a person with regular income having noncontingent, liquidated, unsecured debts of less than $250,000 may be a Chapter 13 debtor. Calling the claims disputed, contingent and unliquidated in bankruptcy schedules does not make them so.

Lay aside these concerns and assume that Mrs. Davis was rendered insolvent by the foreclosure of the Property. The remaining element in her section 548 case is that the consideration received on the transfer was not the "reasonably equivalent value" of the Property. VWP bid and paid to Merrill Lynch the sum of $360,400.33 for the Property, an amount slightly higher than the debt of the Davises to Merrill Lynch. Mrs. Davis states in her Schedules that the value of the Property is $800,000. Neither VWP nor Merrill Lynch really contests the Debtor's position that the Property is worth over twice what VWP paid for it. Had the transfer taken place in a transaction other than a foreclosure sale, there would be little doubt that the price paid was not the reasonable equivalent value of the Property.

But the transfer was made through a foreclosure sale. In *BFP v. Resolution Trust Corp.*, 511 U.S. 531, 545, 114 S.Ct. 1757, 1765, 128 L.Ed.2d 556 (1994), the U.S. Supreme Court held "that a fair and proper price, or a 'reasonably equivalent value,' for foreclosed property, is the price in fact received at the foreclosure sale, so long as all the requirements of the State's foreclosure law have been complied with." The Court observed, however, that "[a]ny irregularity in the conduct of the sale that would permit judicial invalidation of the sale under applicable state law deprives the sale price of its conclusive force under § 548(a)(2)(A), and the transfer may be avoided if the price received was not reasonably equivalent to the property's actual value at the time of the sale (which we think would be the price that would have been received if the foreclosure sale had proceeded according to law)." *Id.* at 545–546, 114 S.Ct. at 1765. Thus, to succeed under section 548 in avoiding a transfer made at a foreclosure sale, a plaintiff must leap two hurdles. The first is showing that the foreclosing party failed to comply with the requirements of state law, thereby rendering the sale "irregular" and subject to being set aside. Jumping this hurdle removes the otherwise conclusive presumption that the sale price is reasonably equivalent value for purposes of section 548(a)(2)(A). The second hurdle is showing that the price received was in fact not the reasonably equivalent value of the property. The bench mark in the second part of the analysis is not the property's fair market value but rather the price that would have obtained at a properly conducted sale. Neither side offered evidence on the second element.

Citing several circumstances, Plaintiff contends that the foreclosure sale conducted by Merrill Lynch was so irregular that it should be set aside under Georgia law. She cites several alleged defects in the foreclosure process, which she contends individually and

cumulatively chilled the bidding or constituted an unfair exercise of the power of sale in the security deed. She points to the advertisement, which did not mention that Mr. Davis was not in the chain of title, while stating correctly that he had signed the note and security deed. She complains that she was unaware that the sale was taking place and believed that her husband was attempting to refinance the Property. Closely related to this contention is her argument that immediately after turning down an application to refinance, Merrill Lynch unfairly exercised the power of sale because it knew that it was vastly oversecured. She asserts that the announcement that the sale required bankruptcy court approval was factually inaccurate and would have confused potential bidders, particularly since the advertisement mentioned Mr. Davis as a note and security deed signatory. She contends that the announcement gives rise to an issue of "whether prospective bidders had reason to believe that a sale may not be effective in giving them title to the Property or may involve them in litigation." Plaintiff's Consolidated Response to Defendants' Motions for Summary Judgment 15.

Defendants reply that the advertisement and announcement were factually accurate, which they say precludes a finding of irregularity. They argue that Bruce Davis created his own problem by filing bankruptcy. They contend that the announcement, rather than chilling bidding, enhanced it by insuring that a bidder would not be engaged in litigation. Defendants argue that bidders had no basis for feeling uneasy since they had the means to obtain correct information about title to the Property. Defendants say that there is no evidence that bidding was discouraged and no other persons were interested in the sale. Finally, they contend that the announcement was the result of the Plaintiff's own actions or that of her husband in approving the announcement.

■ Most of Mrs. Davis' contentions can be disposed of with ease. Her allegations of fact concerning the negotiations over the refinancing, if true, do not constitute an unfair exercise of the power of sale and did not contribute to a chilling of bids. Merrill Lynch had the legal rights under the contract to declare a default and to reject the application to refinance and to continue with the foreclosure. Moreover, Plaintiff has made no showing that had Merrill Lynch given her the additional thirty days she thought she deserved, she could have refinanced the Property in light of the federal tax lien. In short, the argument that Merrill Lynch's conduct in entertaining and then rejecting a loan application constitutes grounds for setting aside the sale is without merit.

■ Equally without merit is Mrs. Davis' allegation that the sale should be set aside because Merrill Lynch did not give her notice of the sale and that had she received proper notice, she could have averted the sale by arranging for a personal loan from a wealthy friend. Mrs. Davis entrusted Mr. Davis with dealing with Merrill Lynch. Hence, even if she was personally unaware that Merrill Lynch was proceeding to foreclose on the Property, she is charged with her husband's knowledge of the situation. In Georgia, notice of the intention to exercise the power of sale in a security deed on residential property must be given to the debtor by the secured creditor no later than fifteen days before the date of the proposed foreclosure sale. O.C.G.A. § 44–14–162 et seq. Here, the record indicates that on September 29, 1996, an attorney for Merrill Lynch sent a letter addressed to Mr. and Mrs. Davis that stated Merrill Lynch's intention to foreclose on the Property on November 5, 1996. Mrs. Davis had ample notice that her house would be offered for sale. That her husband received the letter from Merrill Lynch is irrelevant. The notice is complete upon mailing to the address of record with the creditor and the debtor's actual receipt of the notice is immaterial. *Cummings v. Anderson*, 173 B.R. 959, 962 (Bankr.N.D.Ga.1994), *citing McCollum v. Pope*, 261 Ga. 835, 411 S.E.2d 874 (1992).

■ Next, Mrs. Davis contends that the advertisement was misleading because it failed to mention that Mr. Davis was not in the chain of tide. As the Defendants point out, the advertisement was in fact accurate. It therefore could not have chilled the sale

because any potential bidder could have learned that Mr. Davis was not in the chain of title by reviewing the public record. *See, Cleveland v. Cleveland,* 235 Ga. 361, 362, 219 S.E.2d 715 (1975) ("Such was a truthful and accurate description of the property to be sold, and could not have chilled the sale since any person inclined to attend and bid at the sale could ascertain from public records the true status of the property.") Whether Mr. Davis was or was not in the chain of title could have made absolutely no difference to a bidder since Mr. Davis subjected whatever interest he might have had to the security deed. Hence, this argument is without merit.

 This brings us to the central issue of whether the announcement read at the sale chilled the bidding. Merrill Lynch sought to resolve the dispute about the application of the automatic stay in Mr. Davis' case by conducting an auction but conditioning issuance of a deed under power on the approval of this court. The idea for such a procedure was suggested by the fact that from time to time in cases filed on the eve of foreclosure, this court enters an order on a motion for stay relief permitting the creditor to cry out the sale but requiring final court approval to record a deed, even if the winning bidder is a third party. The court decides whether to grant that approval after holding a full hearing that affords the debtor an opportunity to be heard. That situation is distinguishable from the present case in many salient respects.

First, in such cases the court has jurisdiction over the debtor and the property and thereby in effect provides the equivalent of the debtor's consent. Second, the bidder has the option to seek, and the court would have jurisdiction to permit, withdrawal of the bid in the event of unforeseen delay. In Mr. Davis' case, although the court granted the motion of Merrill Lynch, it did so only to declare that it lacked jurisdiction with respect to the auction. Third, this court rarely, if ever, approves such a procedure in the debtor's first case; it is reserved for the case of the serial filer who has no serious bankruptcy prospects or is ineligible to be a debtor in a Chapter 13 case. The prior case was

Mr. Davis' first, and this is Mrs. Davis' first bankruptcy case. Fourth, in situations in which this court has authorized property to be auctioned, there is rarely any equity. Here, there appear to be literally hundreds of thousands of dollars of equity. Fifth, in such a procedure the court never requires that a creditor announce at the auction that the sale is subject to court approval. Though the failure to make such an announcement might theoretically subject the creditor to suit by the third party bidder if the sale were not approved, damages would be speculative if the price bid were at or near fair market value. Moreover, the creditor is usually the winning bidder in this type of situation.

Defendants assert that the bid chilling issue is not controlling because Mrs. Davis consented to the announcement. Mr. Davis was Mrs. Davis' agent. Although Mr. Kiefer contends that he was representing only Mr. Davis, Mrs. Davis contends that Mr. Kiefer represented her but that he did not have permission to consent to the sale. If Mr. Kiefer was Mrs. Davis' attorney, as she contends, he might have had sufficient authority, whether or not actually authorized, to bind her. An attorney with apparent authority can bind his client if the opposing party is ignorant of any express restrictions on that authority. *Pembroke State Bank v. Warnell,* 266 Ga. 819, 471 S.E.2d 187 (1996). The doctrine of apparent authority would not be helpful here, however, unless Merrill Lynch's counsel thought that Mr. Kiefer was representing Mrs. Davis. There is no evidence to that effect. Hence, it is not clear on the record that apparent authority to bind Mr. Davis would be enough to bind Mrs. Davis, even though Mr. Davis was Mrs. Davis' agent.

A property owner who participates in conduct that leads to chilling of the bidding may be estopped to complain about it. *See, Ruis v. Branch,* 138 Ga. 150, 153, 74 S.E. 1081 (1912). VWP asserts, without any reference to the record, that Mrs. Davis, through Mr. Kiefer or her husband, approved the making of the announcement. VWP Brief in Support of Motion for Summary Judgment 7. Mr. Kiefer may have consented to the sale on the terms in the announcement, but there is no

evidence that Mrs. Davis or her agent consented to the reading of the announcement at the public sale.

Even if Mrs. Davis consented to the reading of the announcement, that might not be the end of the matter if she was rendered insolvent by the transfer. Proof of the absence of such participation in the irregular sale is not an element in the owner's cause of action; it is simply an equitable defense to an equitable claim. Hence, such participation by the owner/debtor may not be a bar to a similar suit by a bankruptcy trustee.

The issue of authorization can be viewed from the opposite perspective, that of Merrill Lynch's right to make the announcement. The security deed is the contract pursuant to which Mrs. Davis appointed Merrill Lynch as her agent to deal with the Property in the event of a default. The deed authorizes Merrill Lynch to "sell the Property or any part of the Property at one or more public sales ... to the highest bidder for cash, in order to pay the indebtedness secured hereby...." The term "sell" is defined as "to transfer title or possession of property to another in exchange for valuable consideration." *Black's Law Dictionary* 1360 (6th ed.1990). Did Merrill Lynch "sell" the Property, or did it offer only a possibility of buying the Property? There may be a factual, if not a legal, issue whether in the absence of consent from Mrs. Davis, Merrill Lynch acted outside the scope of its authority as Mrs. Davis' agent in making the announcement. If Merrill Lynch was authorized to condition the sale on the announced terms, query whether one ever reaches the question of chilling?

Defendants contend that no bidder other than VWP had an interest in the sale or heard the announcement. Plaintiff responds by pointing to evidence that other bidders for real property were present on the courthouse steps within range of Mr. Sweeton's voice. That other bidders may not have approached Mr. Sweeton when he cried out the location of the Property does not preclude the possibility that the other bidders were interested and might have bid but for the announcement. Although Plaintiff does not allege that an identifiable bidder exists who would testify that he or she heard the announcement and would have bid had it not been made, the Defendants conceded at oral argument that Georgia law does not require proof that a bidder present would have bid but for the irregularity. Construing the evidence in the light most favorable to the non-moving party, the court finds that whether the announcement was or might have been heard by other bidders is a disputed material issue of fact.

Mrs. Davis argues that the announcement made before the foreclosure sale chilled the bidding by discouraging potential bidders from participating. Defendants contend that Mrs. Davis produced no evidence that the announcement might have chilled the bidding, but she does not have the burden of proving her case. Instead, the Defendants, as the movants, must show that no material issue of fact exists. They failed to do so. To be more precise, the Defendants rely primarily on the alleged truth of the announcement as the basis for contending that as a matter of law they are entitled to judgment. That reliance is misplaced, as will be explained below.

Assuming that it could have been heard by other potential bidders present on the courthouse steps at the time of the sale, the announcement could have chilled the bidding. Before explaining why a question of fact surrounds the effect of the announcement on the bidding process, a brief discussion of Georgia law will put the problem in the proper legal framework.

Inadequacy of price, standing alone, will not invalidate a foreclosure sale. *Giordano v. Stubbs*, 228 Ga. 75, 79, 184 S.E.2d 165 (1971). In *Giordano*, the Supreme Court refused to avoid a sale merely because the winning bid was only about one third of the fair market value of the property. It said:

> It is only when the price realized is grossly inadequate and the sale is accompanied by either fraud, mistake, misapprehension, surprise or other circumstances which might authorize a finding that such circumstances contributed to bringing about the inadequacy of price that such a sale may be set aside by a court of equity.

Not every irregularity will serve as a basis for invalidating a foreclosure sale. *Tarleton*

*v. Griffin Federal Savings Bank,* 202 Ga. App. 454, 455, 415 S.E.2d 4 (1992). Rather, the court must determine if the error in question contributed to chilling the price on the sale of the property. *Id.* Thus, "[t]he crucial point of the inquiry ... is to insure that the sale was not chilled and the price bid was in fact market value." *Cummings v. Anderson,* 173 B.R. 959, 963 (Bankr.N.D.Ga. 1994), *citing Stripling v. Farmers and Merchants Bank,* 175 Ga.App. 75, 76, 332 S.E.2d 373 (1985).

Attracting multiple buyers is the paramount goal of a foreclosure advertisement, since competitive bidding will generally yield a higher price. Accordingly, "[e]rrors that would not confuse the bidding intentions of any potential bidder of sufficient mental capacity to enter a binding contract for the sale of the real property do not show a chilling of the sale so that a fair market value bid was not obtained." *Williams v. South Central Farm Credit, ACA,* 215 Ga.App. 740, 742, 452 S.E.2d 148 (1994).

Defendants assert that the announcement was factually accurate. This is a matter of perspective. To the extent that it implied that bankruptcy court approval was a prerequisite as a matter of law for the sale to be consummated, it was not accurate. The announcement did accurately state the terms of the deal to which Mr. Kiefer and attorneys for Merrill Lynch had agreed. Yet, the announcement's accuracy in describing an agreement of the parties hardly precludes the possibility that those terms would not discourage bidding.

The announcement predicted success in five to six weeks but then admitted the possibility of failure. This raises the question whether a bidder would have had confidence in the prediction of the length of delay. If Merrill Lynch was so sure that the automatic stay did not apply, it presumably would not have made the announcement in the first place. In making the announcement and in admitting the possibility that the sale might not be approved, Merrill Lynch at least cracked open the door of possible litigation. It hedged its bet. Would a bidder have hedged its bid?

VWP, actively engaged in this litigation, argues unconvincingly that the announcement enhanced the bidding process because it assured bidders that they would not have to litigate. To the contrary, the announcement did not assure a bidder that it would not become embroiled in litigation. Yet, it left open the possibility that the winning bidder would be locked in as long as Merrill Lynch wants to litigate. Nothing in the announcement gives VWP the option to withdraw its bid if, after some specified period of time, Merrill Lynch remains unable to deliver a deed. What effect might such an arrangement have had on the amount of a potential bid?

A five to six week delay may seem inconsequential when considered in light of the possibility of buying the Property for a fraction of its fair market value by bidding just the amount of Merrill Lynch's claim. The difficulty is the announced possibility that the transaction might never be consummated and that it would be subject to the vagaries of litigation. VWP contends that the announcement would have enhanced bidding because bidders knew that if they were not successful, they would receive a refund. Why would a bidder not get back its money if the seller failed to deliver a deed? The argument dances around but does not confront the problem of uncertainty: the question of how long it might be before a bidder would receive a deed or get back the principal.

Victor Warren testified that the announcement did not affect VWP's bid price. How could it have in light of the huge difference between the bid and the fair market value of the Property and in the absence of other bids? That testimony does not prove that others would not have bid more for the Property but for the announcement. It does not prove that other potential bidders may not have discounted their maximum bids to amounts below what VWP bid to account for each such bidder's personal estimate of how long money might be tied up and what other opportunities might be lost. Nor does it eliminate the possibility that bidders might have been discouraged because of the prospect of litigation, notwithstanding VWP's interpretation of the announcement that a bid-

der need not litigate. VWP points to no evidence that potential bidders, though faced with these issues, would not have been discouraged from bidding the same amounts that they would have if they would have received a deed immediately.

Suppose the existence of two parcels of real property offered for sale at foreclosure. They are identical in all respects, with one exception. Title to Blackacre passes immediately to the highest bidder on the day of the sale in exchange for the cash bid price. But title to the other parcel, Whiteacre, may be passed at some indefinite future date, if at all, with attendant potential to involve the successful bidder in litigation, if not as a defendant, at least as a witness. The bidder for Whiteacre must put up cash on the date of the sale, knowing that it will not collect any interest earned on those funds if the seller's agent is unsuccessful in persuading a court to approve the transfer. The winning bidder is not told that it may unilaterally withdraw its bid and get back the bid price and therefore must assume that its money will be tied up until the process plays itself out, however long it takes. The winning bidder has no assurance that at the future date on which it receives a deed, the property will not have depreciated in value. If the market turns down, the winning bidder has no ability to sell, because it does not yet have a deed to the property. Would it make sense for one to make the same bid for Whiteacre as for Blackacre? Would the average bidder have been discouraged altogether?

The Blackacre/Whiteacre hypothetical illustrates the reasoning that might underpin a factual basis for concluding that uncertainty might have discouraged bidding. Then again, maybe the announcement would not have discouraged bidders. Do bidders routinely pass up bargains? Was there something else here that would totally account for the lack of interest? It is a question of fact whether bidders would have been discouraged by the announcement. Yet, the announcement alone is a sufficient factual showing by the Plaintiff of a possible adverse effect on bidding to survive a motion for summary judgment. As the Defendants point out, the reported cases in Georgia are nearly unanimous in rejecting efforts of owners to overturn foreclosure sales. But in these cases, the appellants uniformly failed to connect the alleged defect to the inadequate price. In the evidence presented by the Defendants, they failed to show the absence of an issue of fact concerning the possibility that the announcement might have contributed to chilling the bidding, resulting in what seems to be a grossly inadequate bid price.

For all of these reasons, it is

ORDERED that Defendants' Motions for Summary Judgment are DENIED and that Plaintiff has ten (10) days from the date of the entry of this order within which either to convert this case to one under another chapter where a trustee or the debtor in possession would have standing in this adversary proceeding or to involve the Chapter 13 Trustee in a manner that insures standing to prosecute it. Otherwise, upon the tendering of the sum of $5,000 to the Debtor, and proof thereof being made on the record, the court will dismiss this case as moot.